## M. & J. TRACY, Inc., v. SOUND S. S. LINES, Inc., et al.

### Nos. 193, 194.

Circuit Court of Appeals, Second Circuit.

Feb. 17, 1944.

Charles W. Hagen, of New York City, for appellant.

Gerald J. McKernan, of New York City, for Tracy Towing Line, Inc.

Before L. HAND, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The Sound Steamship Lines, Inc., owner of the steamer, "Calvert," appeals from a decree in the admiralty, holding it solely liable for a collision between its steamer and two barges belonging to the libellant, in tow of the tug "William J. Tracy," owned by the Tracy Towing Line, Inc. Concededly, either the tug or the steamer, or both, were at fault for the collision, and the only question is upon whom the loss shall fall. The collision took place in the Passaic River at about ten o'clock on the morning of August 17, 1940; the visibility was good, although a little rain was falling; the tide was strong ebb. The "Calvert" is a passenger steamer about two hundred feet long, forty-two feet beam; she had left Newark at 9:30 that morning with 422 passengers on board, bound down stream for Rye Beach. The tug, "William J. Tracy" was towing upstream two loaded coal barges, tandem, rigged two feet apart, and on a bridle twenty-five feet long. The dredge, "Lyons," was at work in the center of the channel, bow down stream; a pipe line, floated on pontoons, led northward from her stern for about seven hundred feet, and then turned sharply eastward to the shore. Together, the dredge and the pipe line occupied more than the east half of the channel, leaving only about 115 feet of the west half open for navigation. The Passaic River flows eastward past East Newark, under a bridge of the Pennsylvania Railroad, and at "Point No Point" takes a turn of ninety degrees to the south, after which it flows substantially south to a bridge of the New Jersey State Highway. The southern end of the dredge—170 feet long—was about 900 feet north of the Highway Bridge, and the collision took place some 200 feet beyond her northern end—say 1300 feet above the Highway Bridge and 1600 feet below the Railroad Bridge.

The "Calvert" passed through the draw of that bridge, and—whether or not she was delayed in doing so—she gathered such speed after she passed through, that at the time of the collision the court found that she was moving at eight knots. After concededly exchanging signals of one blast with the tug, her story is that she bore over to starboard as far as the channel allowed, but that the tug kept coming forward without change of helm into the steamer's water, so that it was impossible to avoid her. The "Calvert" first brushed —"sideswiped"—the tug, and then struck the square-ended bow of the forward barge, about nine feet from the port corner, penetrating three or four feet and pushing her back so hard as to damage the barge astern. The tug's story was that she came up in about mid-channel till she neared the dredge, when, putting her rudder left, she passed alongside, so close aboard that the barges were only six to ten feet off. She had signalled to the dredge which had swung upon her spuds so as to give the tow a better berth; and by the time the tug was alongside, the dredge was at an angle to the thread of the channel of about seventeen degrees, according to an engineer aboard the dredge, whose testimony as to this was likely to be right. After exchanging signals with the "Calvert," the tug kept her very slow speed until the moment of collision. Thus, the crux of the case is whether after passing the dredge, the tug changed her course to starboard and ran parallel with the pipe line, or whether she went straight on across the "Calvert's" bows.

The judge found that she turned to starboard and moved parallel with the pipe line, and we can see no reason for saying that that finding is "clearly erroneous." The tug's master repeated over and over again that he did do just that; and, although he wavered a little as to whether he had changed his wheel, it is clear that such inconsistencies as were developed in his cross-examination arose because he supposed that the dredge lay parallel with the thread of the channel and therefore in line with the pipe line. He was indeed a most confusing and confused witness; but it is improbable that in such close quarters— the vessels had only a margin of forty feet to pass—he should have kept on directly across the "Calvert's" course. We do not forget that he said that he expected the "Calvert" to slow down; much is made of that misunderstanding of the rules. No doubt he did, and indeed common prudence required the steamer to do so in so narrow a berth; but even so, we should have to attribute to him uncommon disregard of his own safety if he was willing in reliance upon that expectation to expose his tow to

534

the oncoming "Calvert." Furthermore, if he had held a straight course parallel with the dredge he would have gone ashore at the edge of the channel only about 300 feet above the dredge, a danger he would surely have tried to avoid. Of course he may not have known where the channel was, but so to assume would be most unreasonable, for he had been navigating the Passaic River for fifteen years, sometimes as often as three times a day. It is far more likely that his recollection was right when he said that he kept close to the pipe line, than when he said that he did not change his helm—knowing as we do, that he was certainly wrong in thinking that the dredge lay in line with the channel, when in fact she lay in line with neither channel nor shore. That he should have floundered upon cross-examination will surprise no one familiar with such testimony. Waterfolk are ordinarily extremely inept verbally; their experience is with the behavior of vessels, to which their craft accustoms them; their management demands few and simple words, and little refinement of conception. The atmosphere of a court room with its charts and models and provokingly persistent inquiry, often disturbs them and makes them inarticulate, or reckless, or defiant. Little dependence can be placed upon what skilful questioning may extract from them; and wise judges rely far more upon what was the most probable shift by which, all things considered, such witnesses would have responded to the situation in which they were placed.

Since therefore we should not, and will not, reverse the finding that the tug kept parallel with the pipe line, it follows that the "Calvert" must have invaded her water. There is some antecedent reason for supposing that she did. While the judge may have been wrong in accepting too literally the estimate of eight knots as her speed, the severity of the blow makes it reasonable to suppose that the mutual approach of the two vessels at the moment of collision was substantial, and to that the speed of the tow certainly contributed very little. It is to be remembered also that the "Calvert" had been coming with the tide under foot on a strong swing to starboard, and that too in a channel only about 115 feet wide.. At a speed, which at any rate appeared very high to several apparently impartial observers, it is not to be wondered at that she should have got out of position. Certainly it was less unreasonable to at-

tribute the collision to the "sheer," which a number of witnesses thought they saw, than to the obstinate perseverance of the tug on a course at once perilous and sure to put her aground. The appeal is another illustration of what apparently it is so hard for the bar to accept: that, in cases where the judge has seen all the witnesses, we will ordinarily resolve disputed questions of fact in favor of his findings.

Decree affirmed.